UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| YUGA LABS, INC., | Case No. 2:23-CV-111 JCM (NJK) |
| Plaintiff(s), | ORDER |
| v. | |
| RYAN HICKMAN, | |
| Defendant(s). | |

Presently before the court is plaintiff Yuga Labs Inc. ("plaintiff")'s motion for default judgment. (ECF No. 23). Defendant Ryan Hickman ("defendant") sent a letter to the court *pro se* purporting to oppose that motion (ECF No. 24), to which plaintiff replied (ECF No. 25).

I.  **Background**

Because the clerk has entered default against defendant "the well-pleaded factual allegations of the complaint are taken as true, except for those allegations relating to damages." *Geddes v. United Fin. Grp.,* 559 F.2d 557 (9th Cir. 1977). The court thus treats each of plaintiff's asserted facts as true, incorporates those allegations, and provides a factual summary of the complaint below.

Plaintiff is a company responsible for developing the "smart contract" underlying a series of non-fungible tokens ("NFTs") called the "Bored Ape Yacht Club" ("BAYC"). (ECF No. 1 at 4). As the court understands the technology, NFTs are digital identifiers that provide the purchasing user with a unique piece of content—here, digital art. Plaintiff sold 10,000 unique BAYC NFTs for prices ranging from $169 to $236 each. (*Id.*)

Plaintiff's NFTs enjoyed wide public recognition and were prominently featured in popular press. (*Id.* at 4–5). They were resold for millions at auction, and popular brands sought plaintiff

James C. Mahan
U.S. District Judge

out to collaborate and capitalize on the success of the BAYC NFTs. (*Id.* at 5–6). Because of that recognition, plaintiff sought to register several trademarks in the BAYC NFTs and at the time the complaint was filed had several pending trademark registrations for "BORED APE YACHT CLUB," "BAYC," "BORED APE," and three different logos in several different classes of goods. (*Id.* at 6–10). Plaintiff has used the marks in commerce since at least 2021, and consumers associate the marks with plaintiff. (*Id.* at 10—11).

Defendant is a Nevada resident. (*Id.* at 3). Alongside three non-parties to this suit, he created a separate smart contract ("RRBAYC RSVP") that underlies a series of NFTs called "RRBAYC." (*Id.* at 11). These "copycat" NFTs use different digital identifiers than plaintiff's (and come from a different source), but purport to provide the purchasing user with the same product as plaintiff's BAYC NFTs. (*Id.*) That is, defendant's copycat NFTs provide the user with the same images produced by plaintiff's BAYC NFTs. Defendant sold his NFTs on the domain "rrbayc.com"—a website that, in addition to its name, made use of several of plaintiff's other marks. (*Id.* at 11–12).

Defendant, alongside others, proceeded to sell these counterfeit NFTs on other online exchanges in direct competition with plaintiff while using plaintiff's marks to advertise his counterfeit NFTs. (*Id.* at 12–14). He did so despite knowledge that consumers would be confused into thinking they were buying legitimate BAYC NFTs. (*Id.*)

Defendant also designed a bespoke marketplace for his RRBAYC NFTs to be sold alongside original BAYC NFTs called "Ape Market," operating at the web address "apemarket.com." (*Id.* at 14–15). In order to access Ape Market, users were required to purchase a RRBAYC NFT. (*Id.*) Ape Market featured several of plaintiff's marks, and it appears the defendant's primary goal was to mislead consumers such that they could not tell whether they were buying one of the original BAYC NFTs that was being resold or one of his counterfeit RRBAYC NFTs. (*Id.*)

Throughout this conduct, defendant used the social media platform formerly known as Twitter to advertise his fraudulent NFTs. (*Id.* at 15–16). He created promotional material meant to imitate plaintiff's material and paid for promotion of his own products. (*Id.*) Moreover, he

James C. Mahan
U.S. District Judge

made public statements that "[Intellectual Property] in NFT is myth." (*Id.* at 16). In the end, defendant and his compatriots sold the counterfeit RRBAYC NFTs to more than 3,000 consumers, and he had an agreement to receive 15% of the all sales in exchange for his development and promotional work. (*Id.*)

As a result of all this, plaintiff brought this complaint alleging two causes of action: (1) false designation of origin under 15 U.S.C. § 1125(A) related to defendant's unauthorized use of plaintiff's marks in creating and promoting his counterfeit NFTs, and (2) cybersquatting under 15 U.S.C. § 1125(D) related to defendant's intentional use of two domain names that are confusingly similar to plaintiff's marks to mislead consumers. After being served, defendant failed to respond to the complaint. The clerk entered his default on March 20, 2023. (ECF No. 20). Plaintiff now moves for default judgment based on that entry of default. (ECF No. 23).

**II.     Legal Standard**

Obtaining a default judgment is a two-step process. *Eitel v. McCool*, 782 F.2d 1470, 1471 (9th Cir. 1986). First, "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). Federal Rule of Civil Procedure 55(b)(2) provides that "a court may enter a default judgment after the party seeking default applies to the clerk of the court as required by subsection (a) of this rule."

The choice whether to enter a default judgment lies within the discretion of the court. *Aldabe v. Aldabe*, 616 F.3d 1089, 1092 (9th Cir. 1980). In the determination of whether to grant a default judgment, the court should consider the seven factors set forth in *Eitel*: (1) the possibility of prejudice to plaintiff if default judgment is not entered; (2) the merits of the claims; (3) the sufficiency of the complaint; (4) the amount of money at stake; (5) the possibility of a dispute concerning material facts; (6) whether default was due to excusable neglect; and (7) the policy favoring a decision on the merits. 782 F.2d at 1471–72. In applying the *Eitel* factors, "the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *Geddes* 559 F.2d at 560; *see also* Fed. R. Civ. P. 8(d).

**III.    Discussion**

Plaintiff has already obtained the clerk's entry of default against defendant. (ECF Nos. 19; 20). Now, in accordance with FRCP 55(b), plaintiff moves for default judgment against defendant on all its claims. (ECF No. 23). While defendant purports to oppose the motion, he does not meaningfully dispute the facts or procedural history of the case. Thus, after considering the *Eitel* factors, the court will GRANT plaintiff's motion and award it $193,863.70 in damages plus costs and attorney fees in an amount to be determined by a subsequent motion.

A.   Defendant's Response

In response to plaintiff's motion, defendant sent a letter to the court *pro se* purporting to oppose an entry of default judgment. (ECF No. 24). Upon closer inspection, however, it appears that defendant does not reference this specific case at all.

As an initial matter, the court notes that a "document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal quotation marks and citation omitted). However, "*pro se* litigants in an ordinary civil case should not be treated more favorably than parties with attorneys of record." *Jacobsen v. Filler*, 790 F.2d 1362, 1364 (9th Cir. 1986). "Although we construe pleadings liberally in their favor, *pro se* litigants are bound by the rules of procedure." *Ghazali v. Moran*, 46 F.3d 52, 54 (9th Cir. 1995). Thus, the court will liberally construe defendant's opposition.

Nevertheless, defendant's arguments are not even responsive to the procedural question before this court—whether default judgment is appropriate. He spends the majority of the letter complaining of purported discovery violations. Namely, that plaintiff's law firm "continues to harass and intimidate" him by making discovery requests in other cases that he believes are overbroad. *See* (ECF No. 24 at 1). That may be true; the requests might be overbroad. But that question (whether he must respond to a discovery request in a separate suit in a different district) is wholly irrelevant to whether default judgment in this matter is appropriate.

Defendant purports to provide evidence that he was never properly served. He attaches as an exhibit screenshots of a surveillance video showing documents blowing in the wind on his

porch. *See* (*id.* at 5). However, it is unclear what those documents were, what date the surveillance footage was taken, or, indeed, why the exhibit is relevant at all. The affidavit of service in this matter explains that a process server served defendant by leaving the documents with a person of suitable age and discretion, which is a valid method of service pursuant to the Federal Rules of Civil Procedure. *See* (ECF No. 18). Simply providing unauthenticated pictures of documents on a porch is not enough to overcome the sworn affidavit of the process server.

Thus, defendant fails to explain his failure to respond to the complaint in *this* action. He does not meaningfully dispute the allegations in this complaint, nor does he provide the court with any evidence contradicting the declaration of service or the subsequent entry of clerk's default. He simply argues that plaintiff's attorneys may have committed discovery violations in other matters and provides an unauthenticated exhibit purporting to show papers on his porch (but not what they were or how they got there). Thus, broadly construing defendant's objections and nevertheless overruling them, the court will consider whether the *Eitel* factors weigh in favor of default judgment.

B. *Eitel* Factors

The first *Eitel* factor weighs in favor of granting plaintiff's motion for default judgment. Plaintiff faces prejudice because defendant's failure to appear and defend the claims against him undermines plaintiff's ability to secure relief against defendant. Therefore, if plaintiff's motion for default judgment is not granted, plaintiff "will likely be without other recourse for recovery." *PepsiCo, Inc. v. Cal. Security Cans*, 283 F.Supp.2d 1127, 1177 (C.D. Cal. 2002).

The second and third *Eitel* factors also weigh in favor of default judgment. Plaintiff's complaint states plausible claims for relief for false designation of origin under 15 U.S.C. § 1125(A) and cybersquatting under 15 U.S.C. § 1125(D). (*See* ECF No. 1). Further, plaintiff's complaint is well pleaded as it identifies defendant, enumerates plaintiff's rights under the Lanham Act, describes the steps defendant took to infringe upon these rights, and sets forth causes of action for defendant's conduct as recounted above in the background section of this order. (*See id.*)

The fifth *Eitel* factor favors default judgment as well. "Once the court clerk enters a default, the well-pleaded factual allegations of the complaint are taken as true, except for those

**James C. Mahan**
**U.S. District Judge**

- 5 -

allegations relating to damages." *Geddes,* 559 F.2d at 560. Given the sufficiency of the complaint, including evidence of plaintiff's trademark rights, defendant's willful infringement, and defendant's default, "no genuine dispute of material facts would preclude granting [plaintiff's] motion." *Cal. Security Cans,* 238 F. Supp. 2d at 1177.

Applying the sixth factor, the court cannot conclude that defendant's default is due to excusable neglect. Plaintiff properly served defendant with summons and the complaint. (ECF No. 18). Defendant's failures to respond and to litigate this case cannot be attributable to excusable neglect and are instead willful. This factor weighs in favor of default judgment.

The seventh *Eitel* factor weighs against default judgment, however. "Cases should be decided upon their merits whenever reasonably possible." *Eitel,* 782 F.2d at 1472. But the mere existence of Rule 55(b) "indicates that this preference, standing alone, is not dispositive." *Cal. Sec. Cans,* 238 F. Supp. at 1177 (citation omitted). Moreover, defendant's failure to respond to the complaint "makes a decision on the merits impractical, if not impossible." *Id.*

Finally, under the fourth *Eitel* factor, the court considers the amount of money at stake in relation to the seriousness of defendant's conduct. *See id.* at 1176. "This requires that the court assess whether the recovery sought is proportional to the harm caused by defendant's conduct." *Trs. of Plumbers & Pipefitters Union Local 525 Health & Welfare Trust & Plan v. T.E.N. Mech. Corp.*, No. 2:10-cv-02258-RLH-NJK, 2013 WL 1249600 (D. Nev. March 27, 2013) (quoting *Landstar Ranger, Inc. v. Parth Enter., Inc.,* 725 F. Supp. 2d 916, 921 (N.D. Cal. 2010)). Plaintiff seeks minimum statutory damages for the two domains implicated in the cybersquatting claim ($2000 pursuant to 15 U.S.C. § 1117(d)), as well as $191,863.70 related to the false designation claim, which it alleges is the amount defendant earned for creating and marketing the infringing NFTs. In addition, plaintiff seeks attorneys' fees and costs.

Plaintiff is entitled to statutory damages since it has succeeded on its cybersquatting claim. *See* 15 U.S.C. § 1117(d). Further, it provides defendant's deposition testimony from another parallel case verifying that he earned $191,863.70 from the infringing tokens. *See* (ECF No. 23 at Exs. A, B). The total monetary damages requests are thus reasonable because the amount represents no more than the harm defendant caused plaintiff.

Thus, save for factor five's preference to resolve cases on the merits, every factor weighs in favor of default judgment. Given this overwhelming balance, the court finds default judgment appropriate and will GRANT plaintiff's motion. To that end, and as discussed in factor four, plaintiff has thus proven its damages calculation and will be entitled to recover $193,863.70 in total monetary damages from defendant.

Plaintiff also seeks attorney fees and costs. Costs and fees are available in cases under the Lanham Act where the acts of infringement are "malicious, fraudulent, deliberate, or willful." When a complaint pleads willful infringement and a district court enters default judgment, the court must find that the infringement was willful when evaluating motions for attorney's fees. *See Derek Andrew, Inc. v. Poof Apparel Corp.*, 528 F.3d 696, 702 (9th Cir. 2008).

Here, plaintiff's complaint alleges that defendant acted willfully and intentionally when he infringed on plaintiff's rights. Because all allegations in the complaint are taken as true upon entry of default, plaintiff has sufficiently proven its entitlement to attorney fees and costs under 17 U.S.C. § 1117(a). Thus, it shall be permitted to file a supplemental motion for attorney fees and a bill of costs for the court to consider.

Finally, plaintiff seeks four forms of injunctive relief:

> (1) an order and judgment requiring Hickman to be enjoined from using the BAYC Marks in any manner, engaging in any act or thing likely to cause confusion to the public as to the source of the products or services; (2) a judgment ordering Hickman to file and serve a report setting forth the manner in which Hickman has complied with the injunction and ceased all offering of products or services under the BAYC Marks; (3) a judgment ordering Hickman to deliver for destruction, or show proof thereof, all infringing material; and (4) a judgment ordering Hickman to withdraw any applications Hickman filed anywhere for the BAYC Marks

(ECF No. 25 at 8). Injunctive relief is available under the Lanham Act. *See* 15 U.S.C. § 1116. Indeed, it is the "remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." *Century 21 Real Est. Corp. v. Sandlin*, 846 F.2d 1175, 1181 (9th Cir. 1988).

A party seeking an injunction (whether preliminary or permanent) must establish four factors: (1) success on the merits (or likelihood thereof, for a preliminary injunction), (2) a

**James C. Mahan**
**U.S. District Judge**

- 7 -

likelihood of irreparable harm without the injunction, (3) a balance of hardships that tips in its favor, and (4) the injunction is in the public interest. *See, e.g.*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In trademark infringement cases, once a party shows a likelihood of success on the merits, there is a presumption of irreparable harm. 15 U.S.C. § 1116(a).

Plaintiff has established each of those factors. Not only has it proven a likelihood of success, but it has actually succeeded on its claim because of this court's grant of default judgment. Because of that success plaintiff is also entitled to the statutory presumption of irreparable harm. *See id.* Moreover, the third and fourth factors tip in favor of plaintiff because without an injunction defendant could continue to market NFTs that infringe on plaintiff's trademark rights, thus confusing consumers. The public interest is served by preventing defendant from marketing competing products using a confusingly similar market, and the hardships plaintiff would have to endure to continue vindicating its rights otherwise (i.e., more lawsuits) counsel in favor of a permanent injunction. Thus, the court is satisfied that a permanent injunction is appropriate, in addition to the other equitable relief that plaintiff requests to effectuate that injunction.

### IV.   Conclusion

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that plaintiff's motion for default judgment (ECF No. 23) be, and the same hereby is, GRANTED.

IT IS FURTHER ORDERED that within seven (7) days of this order plaintiff shall file a proposed judgment consistent with the foregoing.

DATED August 16, 2023.

_____
UNITED STATES DISTRICT JUDGE

**James C. Mahan**
**U.S. District Judge**

- 8 -